# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-0705


### J. C. WHITE, JR.

### VERSUS

### RATCLIFF CONSTRUCTION COMPANY, LLC
### AND THE GRAY INSURANCE COMPANY


\*\*\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2
PARISH OF RAPIDES, NO. 06-08361
HONORABLE JAMES L. BRADDOCK
WORKERS' COMPENSATION JUDGE


\*\*\*\*\*\*\*\*\*\*\*\*


### JIMMIE C. PETERS
### JUDGE


\*\*\*\*\*\*\*\*\*\*\*\*


Court composed of Jimmie C. Peters, Marc T. Amy, and James T. Genovese, Judges.


### REVERSED AND RENDERED.


J. C. White, Jr.
907 6th Street
Colfax, LA 71417
(318) 627-2453
IN PROPER PERSON

Eric J. Waltner
Allen & Gooch
Post Office Drawer 3768
Lafayette, LA 70502-3768
(337) 291-1400
COUNSEL FOR DEFENDANTS/APPELLANTS:
 Ratcliff Construction Company, LLC and
 The Gray Insurance Company

PETERS, J.

The defendants, Ratcliff Construction Company and The Gray Insurance Company, appeal the workers' compensation judge's finding that the plaintiff, J. C. White, Jr., proved that he suffered a work-related injury to his left shoulder and that he is entitled to indemnity benefits even though his doctor had released him to work with no restrictions. For the following reasons, we reverse and render judgment in favor of Ratcliff Construction Company and The Gray Insurance Company.

Ratcliff Construction Company (Ratcliff) hired J. C. White, Jr. to work as a carpenter on its construction projects on September 18, 2006. White asserts in this litigation that within two weeks after going to work for Ratcliff, he suffered a work-related injury to his left shoulder while framing in a porch. White did not immediately report his accident and injury to his employer. Instead, he continued to work without physical complaint until fired by his employer on November 3, 2006.

White sought medical attention for his shoulder for the first time on November 6, 2006, when he was examined by Dr. Gordon Webb, a physician at Louisiana Occupational Health Services Clinic in Alexandria, Louisiana. When completing the history questionaire provided by Dr. Webb, White could not remember the date of his injury. Dr. Webb performed a physical examination, found no evidence of an acute injury, and released White to his regular duties.

Two days later, on November 8, 2006, Dr. Bruce Craig, a physician at the Walk-In Medical Clinic in Alexandria, Louisiana, examined White and concluded that he suffered from chronic shoulder and arm pain. Dr. Craig prescribed medication. At a follow-up visit on December 1, 2006, Dr. Craig recommended that White participate in physical therapy and that an MRI be performed.

At the trial of White's claim for workers' compensation benefits, penalties, and attorney's fees, Ratcliff asserted that White did not suffer a work-related injury during his employment with the company. In doing so, Ratcliff pointed out that White had a history of injuries to his shoulder. After considering all of the evidence, the workers' compensation judge (WCJ) concluded that White had sustained a work-related injury; that he was entitled to weekly indemnity benefits at the rate of $325.00 from November 6, 2006, forward; and that he was entitled to the payment of all past medical treatment and to all reasonable, necessary, and related medical treatment by the physician of his choice. However, the WCJ rejected White's request for penalties and attorney's fees. Thereafter, Ratcliff perfected this appeal, asserting two assignments of error:

1)     The workers' compensation judge committed error, either manifest or legal, in holding that White satisfied his burden of establishing a compensable accident;

2)     The workers' compensation judge committed error, either manifest or legal, in holding that White was entitled to indemnity benefits during the time period that he was released to full duty work.

Because we find merit in the first assignment of error, we do not consider the second assignment of error.

### Assignment of Error Number One

Louisiana Revised Statutes 23:1021(A) defines "accident" as an "unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." "[T]he plaintiff-worker in a compensation action has the burden of

2

establishing a work-related accident by a preponderance of the evidence." *Bruno v. Harbert Int'l Inc.*, 593 So.2d 357, 361 (La.1992).

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson*, 13 Louisiana Civil Law Treatise, Worker's Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by testimony of fellow workers, spouses or friends. Malone and Johnson, *supra*; *Nelson [v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991)]. Corroboration may also be provided by medical evidence. *West, supra.*
>
> In determining whether the workers has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of this testimony." *West*, 371 So.2d at 1147; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987).

*Id.*

The findings of a workers' compensation judge pertaining to the burden of proof and witness credibility are factual in nature and will not be reversed on appeal unless clearly wrong or manifestly erroneous. *Id.*

The WCJ found that White proved by a preponderance of the evidence that he did in fact suffer a work-related accident. In doing so, the WCJ noted that discrepancies existed in the different witnesses's testimonies as to how the accident occurred, but he found White's version to be partially corroborated by one of the witnesses as well as by Dr. Webb's medical notes. The workers' compensation judge further relied on *Bordelon v. Inland Industrial Contractors*, 00-1132 (La.App. 3 Cir. 1/31/01), 783 So.2d 413, *writ denied*, 01-591 (La. 4/27/01), 791 So.2d 119, a case in which this court affirmed a finding that the injured worker's delay in reporting a

3

work-related accident and discrepancies in how the accident occurred did not defeat his claim that he suffered a work-related injury.

In this assignment of error, Ratcliff argues that White failed to establish by a preponderance of the evidence that he suffered a work-related injury. Specifically, Ratcliff argues that White failed to present any evidence that corroborated his version of the alleged accident and that what little evidence he did present discredited and cast serious doubts on his version. We agree.

We first note that the evidence concerning the occurrence of the accident itself does not, standing alone, discharge White's burden of proof on that issue. While White did testify concerning how the accident occurred, his was not the only testimony on this issue as the accident was not unwitnessed. One of the two co-workers present at the time of the alleged accident denied that an accident occurred, and the other's testimony is both internally inconsistent and inconsistent with White's version of the accident.

White testified at trial that he injured his left shoulder while carrying a large beam up a ladder with the assistance of a co-worker, Paul Maxwell. According to White, he and Maxwell were each climbing adjacent ladders while holding separate ends of a two-inch by twelve-inch by thirty-two-foot beam. White testified that Maxwell progressed up his ladder quicker than he did and that by the time Maxwell was at the top of his ladder, he was only half way up his.

According to White, while looking directly at him, Maxwell then pulled the beam towards himself and attempted to jerk it out of White's hand. When White yelled, Maxwell observed that the beam was wobbling in White's hand, but turned away, causing the beam to flip. When White bent down to catch the beam before it

4

hit the ground, he felt something pull loose from his shoulder to his elbow and was jerked off the ladder. White testified that a co-worker helped Maxwell complete the nailing of the beam.

Roderick Page, a co-worker who had also been fired by the company, testified that he saw the accident occur. He testified that he was standing by White and Maxwell as they were climbing the ladders and saw Maxwell drop his end. According to Page, Maxwell's end of the beam hit the ladder, and White, who was still holding the other end, attempted to catch control of it before it fell on Maxwell. He observed White catch the beam in the middle and without dropping his end. Page testified that Maxwell and another employee finished nailing the beam in place. When questioned by the WCJ, he could not remember when the accident occurred, or even when he was fired by Ratcliff.

In his testimony, Paul Maxwell disputed White's assertion that an accident even occurred. Maxwell testified that neither he nor White had dropped or lost control of the beam which according to him, weighed approximately one hundred pounds. According to Maxwell, he and White nailed the board in place without anyone's help.

Thus, White's version was that he caught the one hundred pound beam before it hit the ground and this action on his part caused him to be jerked off the ladder. However, neither Maxwell nor Page corroborated his claim that he fell from the ladder. As pointed out by the WCJ, Page's version of the accident is somewhat confusing. According to Page, when Maxwell dropped his end, it struck one of the ladders. He did not say which ladder. Page then suggested that White somehow reached over and caught the beam in the middle without dropping his end and

5

remained on the ladder. We find that the WCJ's conclusion that Page supported White's version of how the accident occurred was manifestly erroneous.

Furthermore, while we agree that the decision in *Bordelon* supports a finding that an injured worker's delay in not reporting a work-related accident will not, by itself, defeat a claim for workers' compensation benefits, White's action in not immediately reporting the accident is suspect given the other evidence in the record. White testified that from the accident forward, he could not use his left hand and that he complained daily to Maxwell. However, he complained to no one else and he does not suggest he could not perform his duties. He did suggest that because he only performed carpentry work for two more weeks, he was able to continue to work. According to White, most of the work that followed entailed nothing more than hauling and grading dirt and driving a tractor.

Ronnie Kerr, White's supervisor, testified that Ratcliff has a policy that any accident must be reported to a supervisor immediately so that an accident report can be completed, and that the company conducted bi-weekly safety meetings during which this policy was consistently emphasized. The written safety manual which was made available to every new employee included language that stated the required company policy that an employee report an on-the-job accident to a supervisor immediately, but no later than the end of the day when the injury occurred. Both he and Maxwell testified that Ratcliff supervisors held regular safety meetings with the employees, and the issue of immediate reporting of work-related accidents was always brought up. While Kerr could not state specifically that White attended these meetings (although he suggested that White probably did, given company policy), Maxwell remembered specifically that White did attend the meetings. White

6

acknowledged that on the day he was hired, he received a copy of the safety manual, but claims to have never read it. While claiming that he was unable to use his left hand after the accident, his stated reason for not immediately reporting the accident to his supervisor was his fear of both he and Maxwell losing their jobs.

Kerr testified that on November 3, 2006, he confronted White about missing work the previous day. According to Kerr, White was late that day, and when confronted, White initially told him that he did not feel like working the day before. However, he changed his story, telling Kerr that he had been arrested for driving while intoxicated and that the day before he had been handling a matter pertaining to his arrest. Initially, Kerr told White to go to work, but changed his mind after he went to his office. He then called White back in and told him that he was not working out as a carpenter. In fact, Kerr wanted to fire White because he believed White had misrepresented his skills as a carpenter. The only reason he offered White a laborer's job was because he knew White and Maxwell rode to work together and he was concerned that firing White would cause Maxwell to have to quit. When White refused to work as a laborer, Kerr fired him. It was at this point, according to Kerr, that White told him that he had injured his arm over a month before. Kerr told White to report the injury to the office and made a notation on White's payroll report.

According to White, he told Kerr that he had missed the previous day because his shoulders were bothering him. He denied having missed work because of his criminal charge, but suggested that he was fired because he had been arrested. He acknowledged that Kerr told him that his position was being changed from carpenter to laborer and his pay was being cut from $15.00 per hour to $7.00 per hour.

7

According to White, he informed Kerr that he would rather quit or be fired than work as a laborer.

White finally reported the accident as instructed by Kerr, but he did so three days later. On November 6, 2006, White informed Christine Drerup, an accountant with Ratcliff, that he had injured his arm and needed to see a doctor. However, in identifying when the accident occurred, White informed Ms. Drerup that the accident had occurred the week before. Ms. Drerup testified that she immediately sent him to the Louisiana Occupational Health Services Clinic for treatment. Additionally, she notified an adjustor at the employer's insurer of the claimed accident and forwarded an Employer Report of Injury/Illness to the adjustor. Thus, the evidence surrounding the reporting issue is conflicting.

Finally, we also find that the WCJ erred in concluding that White's version of the accident was supported by Dr. Webb's medical notes. In fact, as is the case with the other evidence, all of the medical evidence in the record is replete with inconsistencies and contradictions.

When he first went to work for Ratcliff, White completed a health questionnaire wherein he denied having suffered any previous work-related injury and denied having ever received any workers' compensation or medical benefits. These statements were false. In fact, White had injured both shoulders and suffered multiple skull fractures in a work-related injury in 1998. As a result of the injuries sustained in that accident, he received both weekly compensation benefits and medical care. When confronted with these falsehoods, White testified that he had answered the questions in the negative at Maxwell's advice.

8

When White first saw Dr. Webb, he completed a questionnaire wherein he stated that the accident occurred when "on a Ladder Paul droped[sic] Lumber on His End And I was holding The other End." He also denied in the questionnaire that he had ever suffered a prior injury to his left shoulder. Dr. Webb's notes state that White and a co-worker were holding a board, which the co-worker twisted and caused to fall from White's hands. His notes state that White grabbed and caught the board with his fingertips, which jerked his entire left side and caused pain from his neck to his forearm. Dr. Webb's notes reflect White's complaints to be pain in his shoulder, especially at night, for the previous five to six weeks. He further noted that White had suffered no previous injury to his shoulder or arm, other than a fracture to his wrist when he was fifteen.

X-rays taken by Dr. Webb revealed a normal left shoulder, considering White's age. Dr. Webb did note in his records that the x-ray showed that the humerus was apparently elevated within the acetabulum and that there appeared to be new bone growth at the inferior glenoid. He concluded that White's complaints were related to an old left rotator cuff tear, that there was no evidence of an acute injury, and that the problem was not work-related. He discharged White with no restrictions and no scheduled return.

Two days later White presented himself to Dr. Craig, who saw him twice—once on November 8 and again on December 1, 2006. Dr. Craig recorded in his notes that White complained of left shoulder and arm pain caused when "[a] wide board was dropped and [White] caught it and it jerked." Dr. Craig initially prescribed muscle relaxers and pain medication. When White returned in December, he related the same complaints. Considering White's complaints to be "chronic," Dr. Craig

9

recommended physical therapy and suggested that an MRI be performed. The MRI was originally scheduled for December 6, 2006, but the record contains no documentation to suggest that it was ever performed.

On March 21, 2007, White appeared at the Louisiana Health Care Services Division, Huey P. Long Medical Center in Pineville, Louisiana, complaining of sharp, throbbing pain radiating into his lower back and pain in his left shoulder. X-rays taken of his lumbosacral spine, left shoulder, and left humerus were all normal. He was diagnosed with osteoarthritis and received a steroid injection before being discharged.

Thus, the medical evidence reflects no suggestion of a recent work-related injury other than the statements of White himself. The findings of both Dr. Webb and the physicians at Huey P. Long Medical Center were within normal limits, and neither found that White was disabled for any reason. The suggestions of Dr. Craig are inconclusive, given the lack of follow-up on the testing suggested. To the extent that Dr. Webb's notes support White's assertion that he sustained an injury, they do so on nothing more than the medical history given to the doctor by White. We find that the WCJ erred in concluding that Dr. Webb's medical notes supported White's claim.

After reviewing the evidence, we find that it was manifestly erroneous for the WCJ to find that White suffered a work-related accident. The evidence presented casts serious doubts upon White's version of the accident, and his testimony is not corroborated by the circumstances following the alleged accident. *Bruno*, 593 So.2d 357.

**DISPOSITION**

For the foregoing reasons, we reverse the judgment of the workers' compensation judge and render judgment in favor of Ratcliff Construction Company and The Gray Insurance Company dismissing the claim of J .C. White, Jr. for workers' compensation benefits. We assess all costs of these proceedings against J. C. White, Jr.

**REVERSED AND RENDERED.**